# THE SUPREME COURT

OF

# OREGON.

## OCTOBER TERM, 1884.

[Filed December 22, 1884.]

## PERRY BAKER v. GEO. WOODWARD.

DEED — DEFECTIVE ACKNOWLEDGMENT — EQUITABLE TITLE — COVENANT, EFFECT OF. — Where A, B, and C jointly occupying a tract of land, and claiming to be proprietors thereof, the title to which is in the United States, join in a deed, by which they release, confirm, and quit claim to one of their number, B, a designated part thereof, and such deed contains covenants to warrant and defend against all persons, except the United States, and for further assurance, but was not so attested as to entitle it to record, and afterward A obtained a patent for said tract, *held*, that B or his grantees thereby became the equitable owners of such land, against all persons having knowledge or notice of their rights.

QUIT-CLAIM DEED — PRIOR EQUITIES. — A, after obtaining the patent, conveyed and quit claimed to D " all his right, title, and interest" in said tract. Such deed passed only such an estate as the grantor had a *legal right* to convey by deed of bargain and sale, and D took subject to B's prior equities in the land.

CONVEYANCE UNRECORDED — JUDGMENT LIEN — PRIORITIES — NOTICE. — A conveyance of real property in this State is void as against the lien of a judgment, unless such conveyance be recorded at the time of docketing such judgment, or within the time after its execution provided by law as between conveyances for the same real property; but such lien would not prevail over a prior unrecorded conveyance, unless it also appeared that the lien was taken or acquired in good faith, without knowledge or notice of such prior unrecorded conveyance.

QUIT-CLAIM DEED — NOTICE. — The fact that a vendor holds only under a deed of quit-claim and release is sufficient notice to a vendee to put him upon inquiry as to the true state of the title.

REFEREE — ORAL EVIDENCE — DOCUMENTS. — A referee to take testimony is appointed only to take oral proofs in the case. Written documents, especially when proved by being authenticated as provided by statute, may be put in evidence at the hearing.

STATUTE OF LIMITATIONS — CONSTRUCTION OF STATUTE — SUITS BETWEEN DONATION CLAIMANTS. — The limitation of five years within which to commence suit in the cases specified in section 378 of the Civil Code, was intended to apply only to controversies arising under section 501 between rival claimants to the same tract as patentees of the State or the United States.

MULTNOMAH COUNTY. Defendant appeals. Affirmed without costs.

*Sidney Dell,* for Appellant.

The deed from Coffin, Lownsdale, and Chapman to Lownsdale is one of release and quit claim between tenants in common of the possessory rights they then had, and concedes the title not to be in them but in the United States, against which they do not warrant. There being neither a warranty nor an assertion of title, subsequently acquired title does not enure to the grantee. (*Taggart* v. *Risley,* 4 Oreg. 235; *Dolph* v. *Barney,* 5 Oreg. 191.) When in a deed of release and quit claim there is a covenant of general warranty, the warranty attaches only to the interest the grantor then had, and does not operate to convey after acquired title. (*Kimball* v. *Semple,* 25 Cal. 440; *Gee* v. *Moore,* 14 Cal. 472; *Davenport* v. *Lamb,* 13 Wall. 419; *Fields* v. *Squires,* Deady, 366.) This suit falls within the provisions of section 378 of the Code, and the time limited by that section had elapsed prior to March, 1872, and no subsequent legislation could affect the rights of the patentee or his grantees. (*Baldro* v. *Tolmie,* 1 Oreg. 176; *Holden* v. *James,* 11 Mass. 396.)

*J. C. Moreland,* and *P. L. Willis,* for Respondent.

The deed under which respondent claims was construed in *Bohlman* v. *Coffin,* 4 Oreg. 313, and that decision is conclusive of this case, unless it shall appear that appellant or his grantor was a purchaser in good faith without notice, and for a valuable consideration. A *bona fide* purchaser, to be adjudged such, must aver and

*prove* that he paid the purchase money before notice. (*Harris* v. *Norton*, 16 Barb. 265; *Boone* v. *Chiles*, 10 Peters, 177; 2 Pom. Eq. § 784; *Woodruff* v. *Cook*, 2 Edw. Ch. 261; *Everts* v. *Agnes*, 4 Wis. 343; *Weaver* v. *Barden*, 49 N. Y. 286; *Duncan* v. *Johnson*, 13 Ark. 190; *Nolan* v. *Grant*, 53 Iowa, 392.) A deed which conveys only *all the right, title, and interest* of the grantor in a certain tract means all that the grantor owns in that tract; i. e., all that he may have owned which he has not parted with. (*Adams* v. *Cuddy*, 13 Pick. 460; *Jamaica Pond Corp.* v. *Chandler*, 91 Mass. 159; *Oliver* v. *Piatt*, 3 How. 333; *May* v. *Le Clair*, 11 Wall. 232; *Dickerson* v. *Colgrove*, 100 U. S. 578; *Baker* v. *Humphrey*, 101 U. S. 499.) Since the sale in 1850, neither the appellant nor his grantors have ever had any interest in the property in controversy except as trustee, to hold the naked legal title for the respondent and his grantors. Time does not bar such a trust till it is disavowed. (*Boone* v. *Chiles*, 10 Peters, 223; *Oliver* v. *Piatt, supra*. And see *Gerdes* v. *Moody*, 41 Cal. 335; *Bailey* v. *Carleton*, 2 N. H. 9; S. C. 37 Am. Dec. 190, n.; Angell on Limitations, § 392.) Title cannot be acquired by adverse possession alone in Oregon. (*Goodwin* v. *Morris*, 9 Oreg. 324.) This suit does not fall within the provisions of section 378 of the Civil Code; that appears to refer only to cases where each contestant deraigns his right through a patent or claim from the State or United States, distinct from the claim of his adversary.

THAYER, J.—This appeal involves the right to and ownership of lot 4, in block 108, city of Portland. The facts in the case show that Stephen Coffin, Daniel H. Lownsdale, and W. W. Chapman were, on the 25th day of June, 1850, joint occupants of the town site of said city, claiming to be the proprietors thereof, the title to which was in the government of the United States; that at said date the said proprietors united in a deed, by the terms of which the three, in consideration of the sum of $6,000, released, confirmed, and quit claimed to one of their number, Lownsdale, and to his heirs and assigns, forever, a number of lots and blocks in said town, including said

block No. 108; that said deed was executed under the hands and seals of the said parties, but was not witnessed or properly acknowledged. The certificate of acknowledgment was signed by a notary public, with a seal attached, and was in due form, except that he did not certify that he knew said parties to be the persons described in and who executed the said deed. The deed contained the usual *habendum* clause, a covenant to warrant and defend the title against the claim of all persons, the United States excepted; and a further provision that if the grantors obtained title from the United States, they would convey the same to the grantee by deed of general warranty.

The said deed appears to have been recorded in the office of the then auditor and recorder of Washington County, August 5, 1854, which county at that time included the present territory of the city of Portland. That on the 11th day of February, 1854, said Lownsdale executed under his hand and seal, and duly acknowledged, a deed, by the terms of which he, in consideration of the sum of $265, granted, bargained, and sold said lot 4 to Alexander Campbell, with a covenant similar to that contained in the deed to himself, as to further assurance in case he obtained a patent for said land from the United States. Said deed was properly witnessed, and recorded August 5, 1854, in the office of said auditor and recorder. The respondent, by mesne conveyances, afterwards succeeded to the rights of the said Campbell to said lot, the last of which conveyances bears date June 20, 1883. Said Stephen Coffin obtained a patent from the United States, March 2, 1861, to a certain tract of land, including the lot and block in question, and on the 20th day of August, 1870, executed a deed to Charles M. Carter, by the terms of which he, in consideration of the sum of $7,000, bargained, sold, granted, and conveyed to the said Carter, and to his heirs and assigns, all his right, title, and interest in a tract of land consisting of 323 and a fraction acres, and which included said lot and block, and a large number of other lots and blocks in said city of Portland. Said deed was duly witnessed and acknowledged, and was afterwards, and on the 30th day of September, 1870, recorded in the office of the clerk of

the county of Multnomah.    On the 3d day of April, 1876, Ira
F. Powers obtained a judgment in the county court for said
county of Multnomah against the said Carter, which, having
been docketed, an execution was subsequently issued thereon,
and levied upon said lot 4, and under and by virtue of the said
execution said lot was sold to Sidney Dell, and a sheriff's deed
executed to him in pursuance thereof, on the 8th day of April,
1882.    On the 17th day of June, 1882, said Dell executed a
deed to the same to the appellant, for an acknowledged con-
sideration, appearing from a recital in said deed to have been
$2,000.    On the 21st day of February, 1881, J. H. Lappeus,
chief of police of the city of Portland, as such chief of police,
executed a deed to said lot to the city of Portland.    Said deed
was duly witnessed, acknowledged, and on the 8th day of
March, 1881, duly recorded in the office of the clerk of said
county of Multnomah.    It was recited in said last-mentioned
deed that, by virtue of a warrant duly issued by the auditor
and clerk of the city of Portland, dated on the 5th day of
January, 1881, commanding the said chief of police to levy
upon lot No. 4, in block No. 108, situate, lying, and being in
the city of Portland, county of Multnomah, State of Oregon,
and to collect an assessment due thereon of $802.42, for the
improvement of Harrison Street, in said city, being the amount
assessed against said lot for said improvement of Harrison
Street, between Water and Front Streets, in said city, the same
being the amount assessed against said lot for said improve-
ments, and remaining unpaid, the said chief of police duly
levied upon the said lot No. 4, in block No. 108, and at a
public sale of said land, held at the court-house door in the city
of Portland, county of Multnomah, and State of Oregon, on the
21st day of February, 1881, in accordance with an advertise-
ment for the sale of said land for unpaid street assessments due
thereon, said chief of police on that day sold to the city of Port-
land, and to its assigns, all of said lot, for the sum of $863.44,
said city of Portland being the highest bidder, and that being
the best bid thereon; and that said city had that day paid to
the said chief of police said sum of $863.44 for said lot.

It further appears that on the 26th day of November, 1881, said city of Portland, in accordance with an ordinance enacted by its common council, executed a deed to said lot 4 to the respondent. It is to be inferred from the evidence that at the time Coffin executed the deed of August 20, 1870, to Carter, Coffin had sold off in lots and blocks a great portion of the tract of land so patented to him. The evidence shows that streets had been laid out and opened across it, and that it had been extensively built upon, and was then occupied by persons claiming to own distinct parcels thereof. Carter himself testifies in his deposition, taken under a commission which issued out of said Circuit Court, that a part was improved and a part not; and when interrogated as to whether Harrison Street school building, Smith Bros.' foundry, Smith Bros. & Co.'s saw mill, John Honeyman & Co.'s foundry, No. 1 stables, St. Mary's academy, water company's reservoir, No. 5 engine house, the Portland Mechanic's Fair building, were not upon the lands described in that deed, answered, in substance, that they were there, excepting the Harrison Street school building and the Mechanic's Fair building; and he further stated that the sale, referring to the said deed of August 20th, included in the Coffin tract whatever lots and blocks Coffin owned in that tract at that time. He also stated that the consideration mentioned in said deed from Coffin to him was on account of liabilities of Coffin which he assumed, amounting to about the sum mentioned as the consideration in said deed, and that he (Carter) received in payment thereof the said deed, and railroad lands in the counties of Washington and Yamhill, and a farm on Sauvie's Island. In answer to another interrogatory annexed to said commission, as to whether he purchased said real estate, including said lot, in good faith, he replied that he did; that he purchased it as he did the other property, in good faith; that he had no actual knowledge of Lownsdale's claim to parts of the Coffin tract until after his purchase; that he was aware of a rumor that Lownsdale laid claim to certain lots and blocks, but nothing definite.

It also appears in evidence that Carter had been the owner

of considerable real property in the city of Portland, and had dealt quite extensively in real estate in said city. No deed appears to have ever been made by Coffin to Lownsdale, in accordance with the covenant in said deed of June 25, 1850, that in case title was obtained from the United States, etc., he would convey by deed of general warranty, etc., though said Coffin did, on the 24th day of January, 1882, execute a deed to the respondent, by the terms of which he, in consideration of ten dollars, released and quit claimed to respondent the said lot 4; said deed was duly acknowledged, and on the 31st day of January, 1882, recorded in the office of the clerk of the county of Multnomah. It also appears in evidence that said lot 4 remained vacant and unoccupied until December, 1882, when the respondent went into actual possession thereof, and is still in possession of the same. It appears from the pleadings that some time in 1882 the appellant commenced in the said Circuit Court an action at law against the respondent to recover the possession of said lot, claiming to be the owner thereof in fee. This suit was commenced by the respondent against the appellant to restrain his said proceedings at law, claiming that he was the equitable owner of said lot as against the appellant, and everyone through whom he derived his legal title.

The main points presented by the case are: (1) The nature and effect of the deed of June 25, 1850, from Coffin, Lownsdale, and Chapman to Lownsdale; (2) of the deed of August 20, 1870, from Coffin to Carter; (3) the effect of the judgment in favor of Powers and against Carter; (4) the rights of the appellant acquired from Dell; and (5) the effect of the amendment of section 378 of the Civil Code, approved October 22, 1870, which provides that suits to set aside, cancel, annul, or otherwise affect a patent to lands issued by the United States, etc., shall be commenced within five years, etc.

The first point has been determined by this court. In *Bohlman* v. *Coffin*, 4 Oreg. 313, the validity and effect of the deed of June 25, 1850, was directly passed upon. In that case Bohlman claimed certain premises included therein under mesne conveyances from Lownsdale. The court there held that said deed

was good and valid, and that Coffin was bound by the covenant to make a deed of general warranty. The court used the following language:—

"The first question of importance is as to whether Coffin was bound by the covenant in the deed to Lownsdale of June 25, 1850. That was a good and valid deed as between Chapman and Coffin, grantors, and Lownsdale as grantee, and we are of the opinion that Coffin is bound by the covenants of further assurance therein contained, and that it was his duty to have executed to the assignees of Lownsdale, under the deed, a deed of general warranty after he obtained his patent from the general government." (*Bohlman* v. *Coffin*, 4 Oreg. 315.)

At page 318 the court said:—

"It follows that Carter stands in the same position as his grantor. He has the legal estate, but he holds it as the trustee of Bohlman, who is the equitable owner."

There was this difference in the facts of the two cases: Bohlman, and those under whom he claimed from Lownsdale, had been continuously in possession of the premises in controversy, which fact, of course, was held to be notice to Carter when he obtained the deed from Coffin; but from the view we take of the case, that circumstance is not material.

This brings us to the second point. The deed to Carter from Coffin was of the right, title, and interest of the latter to the former in the said tract of land. That only extended to the right, title, and interest remaining in Coffin after the conveyance of the equitable estate in the lot and block to Lownsdale. Section 8, chapter 6, Misc. Laws of Oregon, provides that "a deed of quit claim and release, of the form in common use, shall be sufficient to pass all the estate which the grantor could *lawfully convey* by a deed of bargain and sale." This provision is the same as one in the Minnesota statute, and which has been construed by the courts of that State to mean that such a deed shall be sufficient to pass all the estate which the grantor had legal right to convey by deed of bargain and sale (*Martin* v. *Brown*, 4 Minn. 292, Gil. 209; approved in *Marshall* v. *Roberts*, 18 Minn. 408, Gil. 366); which means

that the grantor can, by such kind of deed, convey the residuum of the estate he has and no more, and the grantee necessarily understands that he is, in such case, simply acquiring the estate of the grantor, subject to his prior conveyance of any estate or right in the premises. The same rule also exists independently of any statute. (*May* v. *Le Claire*, 11 Wall. 232.)

In this view of the case, Carter acquired nothing in the tract of land by virtue of the deed of August 20, 1870, beyond the bare legal title which Coffin was then holding in trust for the use and benefit of Lownsdale and his grantees. He had no legal right to convey more than that, and his quit-claim deed and release confines his conveyance to that alone. Carter evidently understood that he was only buying Coffin's interest in the property described in said deed; as he says in the deposition referred to, that "the sale included in the Coffin tract whatever lots and blocks Coffin owned in that tract at that time." Coffin did not at that time own block 108, except as before mentioned. The equitable title thereto had been conveyed away, and it never passed to Carter, nor had he any right to expect otherwise. A release at common law of any interest in lands was made to the person who had the possession thereof, or some interest therein. It is defined in Sheppard's Touchstone: "The conveyance of a man's right, which he hath unto a thing, to another that hath the possession thereof, or some estate therein" (ch. 19, p. 320); and it was contrary to the nature of a release to give possession. One tenant in common could not release to his companion, because they had distinct freeholds. When a man had the right and possession in him he was compelled to convey by feoffment. He could give a release only when out of possession, and it could then only be made to the one in possession. It was the conveyance of a right to a person in possession. (Ch. 19. p. 320, n. 1.)

Said section 3 of the Miscellaneous Laws of Oregon, before referred to, has changed the common law upon that subject so far that a person may release the right to an estate or interest therein to one out of possession, or who has no interest in the estate; but such person, by that form of conveyance, can only

release the interest he has therein the same as at common law. Nor is it any more effectual now to cut off outstanding equities than formerly. The releasee only bargains for the interest of the releasor, and has no right to claim anything beyond that. It would, however, require an immense amount of credulity, in view of the facts and evidence in this case, to believe that Carter was a purchaser in good faith of the lot in question under the deed from Coffin of August 20, 1870, without notice of the deed of June 25, 1850. He did not know the fact that the deed last referred to had been made, in the sense one would know such a fact from being present when it occurred; but we are inclined to believe that "the rumor" that he was aware of, "that Lownsdale laid claim to certain lots and blocks," could not have been as vague as might be inferred from his testimony. Too many valuable lots and blocks were affected by that deed to permit the fact of its execution to pass unnoticed by residents and land-owners of the city of Portland; nor would his testimony, or the allegations in the answer as to that matter, authorize us in finding that he was such purchaser; but we prefer to place our decision of that point upon the legal effect of the deed he received from Coffin, as before indicated.

The third point—the effect of the judgment recovered against Carter by Powers—is more difficult to determine. The rule formerly was, in most of the States, that a prior unrecorded mortgage or an outstanding equity was superior to a subsequent docketed judgment. It was established as a part of the equity jurisprudence, and based upon the principle that equitable interests *in rem*, including equitable liens upon specific parcels of land, had priority over a general statutory lien of a subsequent docketed judgment. It was the general rule of equity that the judgment lien only extended to the actual interest of the judgment debtor, and was subject to all existing equities which were valid as against such debtors; but section 268 of the Civil Code of this State has materially interfered with that doctrine by providing that a conveyance of real property, or any portion thereof or interest therein, shall be void, as against the lien of a judgment, unless such conveyance be recorded at the

time of docketing such judgment, or recorded within the time after its execution provided by law, as between conveyances for the same real property. This section of the Code was enacted by the legislative assembly of the State, October 11, 1862.

This court, in *Stannis* v. *Nicholson,* 2 Oreg. 332, held that a judgment becomes a lien upon real estate from the time of its docketing, subject to the known equitable rights of others in the premises; and in *U. S.* v. *Griswold,* 7 Sawy. 332, the Circuit Court of the United States for the district of Oregon intimates that such lien would not prevail over an unrecorded conveyance by virtue of said section 268, unless it also appeared that the lien was taken or acquired in good faith, without knowledge or notice of such prior unrecorded conveyance. The reason assigned by the court for the view suggested was the fact that the conveyance of a subsequent purchaser, though first recorded, is not allowed by an analogous section of the statute to prevail over that of a prior purchaser, unless obtained in good faith. The same view is maintained in *Lamberton* v. *Merchants' Nat. Bank of Winona,* 24 Minn. 281, in reference to a similar provision of the statutes of that State, and the same reason given therefor. The construction given to the provision of the statute under consideration by the authorities referred to is not in accordance with its literal reading, yet it is entirely consistent with the reason and spirit of the statute, and we feel constrained to adopt it in this case. But it is contended by the appellant's counsel that Powers took and acquired his lien in good faith, and without notice of the outstanding deed of June 25, 1850, executed to Lownsdale. As a matter of fact, Powers may never have had actual knowledge of the existence of that deed. He is chargeable, however, with notice of the kind of deed under which Carter claimed the premises. That instrument constitutes a part of his chain of title. The lot in question was unoccupied, and if he believed, when his judgment against Carter was entered, that the latter was the owner of it, he must have so concluded from an inspection of the deed, or of the record thereof. He occupied the same position as would a purchaser of Carter's interest in the property, and had con-

structive notice of every matter appearing upon the face of the deed under which he claimed to have acquired his lien upon it. (Pom. Eq. Juris. § 624.) Powers could not have supposed that he was obtaining a lien by virtue of the docketing of his judgment upon said lot 4, beyond the interest Coffin had in it on said 20th day of August, 1870, which was the interest therein that Coffin then had "the legal right to convey."

It would be absurd to claim that Powers, by virtue of his judgment against Carter, acquired a lien on something Carter never owned, nor could have been presumed to have acquired under the deed executed to him by Coffin. The judgment was a lien upon the real property of Carter (§ 266, Civ. Code), and by force of said section 268, upon any property he might have conveyed away, in case the deed of conveyance had not been recorded as provided by said latter section. It would be unreasonable, in my opinion, to hold that said section 268 intended that a judgment creditor, by the docketing of his judgment, would secure a lien upon any other real property than that which the title deeds of the judgment debtor showed him to be the owner of, unless it were shown that he had succeeded to it in some other manner. If the deed to Carter had purported to convey to him the property in question, the case would have stood differently. Then it would have been a case in which a grantor had conveyed the same property twice, and the judgment having been recovered without knowledge to the judgment creditor of the prior conveyance, his lien might attach to the entire property. But it must be borne in mind that Coffin did not convey the same property twice. He first conveyed the substance of the estate to Lownsdale; afterwards the residue, which was the nominal legal title, to Carter. (*Adams* v. *Cuddy*, 13 Pick. 463.) The case stands upon the same footing as where A, being the owner of an estate, conveys an undivided half interest in it to B, and then quit claims his interest in it to C. The latter obtains thereby only the remaining half interest, and in case B should obtain a judgment against C, it would only bind such interest, although B's deed were not put upon record. It would not be a lien upon B's

interest, for the reason that the deed to C did not purport to convey any other or greater interest in the estate than A had. The section of the statute (§ 268) is a statute to prevent frauds. (*Fash* v. *Ravesies*, 32 Ala. 454.)   It is evidently intended that a judgment, when docketed, should be a lien upon all the property of the judgment debtor shown by the records to belong to him, notwithstanding he had conveyed away the same, or a portion thereof, or an interest therein, by a conveyance not recorded at the time of the docketing of the judgment, and not within the time after its execution provided by law.

The fact that Carter was only holding under a deed of quit claim and release from Coffin was sufficient notice to Powers to put him upon inquiry as to the true state of the title; and by parity of reasoning, the rule in such case should be the same as in the case of a purchaser who has knowledge of a fact sufficient to put him upon inquiry as to the existence of some right or title in conflict with that he is about to purchase; in which case he is presumed either to have made the inquiry and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his claim to be considered a *bona fide* purchaser.   (*Williamson* v. *Brown*, 15 N. Y. 354.) The rule under the equity practice was that a purchaser, claiming to have been such in good faith, must, in his answer or plea, show how the grantor acquired title, and that the title purchased must be apparently perfect, good at law, a vested estate in fee simple.   (2 Lead. Cas. Eq. 100, 4th Am. from 4th London ed.)   Also, that the plea must aver, if the conveyance pleaded were an estate in possession, that the vendee was seized or pretended to be seized at the time he executed the conveyance, and that he was in possession thereof.   (Daniell Ch. Pl. & Pr. 4th Am. ed. 671, 672.)   This we may imply was required, because a party would not be a purchaser in good faith if the facts were otherwise.

When the judgment against Carter was entered he was not seized or possessed of the lot in suit, nor did he have any apparently perfect title thereto.   Besides, there is a difference between the lien of a judgment upon real property and a pur-

chase of it in favor of the latter and against the former in this: A purchase may be of the absolute title to the property. The purchaser could refuse to buy an estate except upon the terms that he obtain complete ownership of it, while the judgment creditor only secures a lien upon the interest his debtor has in it, benefited, of course, by the provision of said section 268. If the judgment debtor have but an estate for life in the property, the lien of the judgment only attaches to that. The judgment creditor has no right to expect anything beyond that; but a purchaser may bargain for a perfect title, and expect, when he receives the conveyance, that he is obtaining such title. The claim of the latter to protection in such cases would, therefore, be stronger than in case of the former. Equity would require of a judgment creditor a more thorough examination into the condition of the debtor's title than it would of a purchaser, where the question of good faith is involved. When Powers ascertained that Carter was holding under a deed of Coffin's interest to a large tract of land, a great portion of which had been disposed of by him at the time of its execution, he should have made some effort to learn the status of the title to said lot 4. That deed informed him, in substance, as stated by Chief Justice Shaw, in *Adams* v. *Cuddy, supra,* that Coffin had conveyed to Carter all the right and title he "had not legally parted with," and before he can claim to have taken the said judgment in good faith, he should have endeavored to find out whether Coffin had not parted with the title to said lot, or in some manner affected it. The evidence, however, does not show that he made any attempt in that direction. The deed of June 25, 1850, had been recorded in the book of deeds of the county, and it imparted just as much notice, in fact, as though it had been properly acknowledged. There were no witnesses to its execution, but the law at that time required none. By the curative statute, approved October 20, 1876 (Sess. Laws 1876, p. 27), the defect in its acknowledgment was corrected, and by a like statute, approved October 19, 1878 (Sess. Laws 1878, pp. 82, 83), the record of such a deed, duly certified, was made evidence in the courts. These legislative acts may not

have operated retrospectively, but they enabled a party to, prove such deeds by an authenticated copy from the record thereof.

The decision in *Bohlman* v. *Coffin, supra,* was announced in 1873, and it hardly seems possible that anyone living in Portland, under all the circumstances, could, on the 3d day of April, 1876, the time Powers' judgment was entered, have been ignorant of the fact that the deed of June 25, 1850, had been executed. At all events, it is not shown that Powers made any effort to ascertain it, which in *Williamson* v. *Brown, supra,* was held to be a degree of negligence fatal to his claim of having been a *bona fide* judgment creditor; and we are not inclined to regard him such, or to hold that the lien created by said judgment attached to any interest in the property beyond that conveyed to Carter.

It was claimed upon the argument by the appellant's counsel that the deed from Coffin to Carter of August 20, 1870, should not be considered as a part of the evidence of the suit, for the reason that it was not proved before the referee appointed to take the testimony. A referee in such cases is only appointed to take the oral proofs in the case. Written documents, especially when proved by being authenticated as provided by statute, may be put in evidence at the hearing. Under the practice in equity it was common to call witnesses at the hearing to prove the execution of an instrument in writing, and when thus proved to give it in evidence, and our Code has not changed the rule. The term "testimony," as used in the Code, must be taken in accordance with its ordinary meaning, which is the statement made by a witness under oath. The respondent, therefore, had a right to introduce a certified copy of said deed at the hearing of the case in the Circuit Court.

The fourth point—the rights of the appellant acquired from Dell—is already determined in part in the determination of the effect of the judgment in favor of Powers. If the lien of that judgment had been entitled to preference over the deed of June 25, 1850, then Dell, as purchaser at the execution sale under the judgment, would have been also entitled to preference

over it, although he had been knowing to the fact of the existence and validity of the deed; and 'the appellant, as purchaser from him, would necessarily have succeeded to the same right of priority. But, as the case stands, such preference cannot be given unless it has been shown that Dell, or the appellant, were purchasers of the lot in good faith, and for a valuable consideration, which consideration must be proved to have been paid independently of any recital in the deeds executed to them, and without notice of the existence of said deed at the time of its payment. The authorities upon this subject are so numerous and uniform that it is unnecessary to cite any of them, and we deem it sufficient to say that the proofs in the case do not show any such payment of consideration or want of notice.

The fifth point involved a construction of the amendment to section 378 of the Civil Code, approved October 22, 1870. The amendment reads:—

"But no suit shall be maintained to set aside, cancel, annul, or otherwise affect a patent to lands issued by the United States or this State; or to compel any person claiming or holding under such patent to convey the lands described therein, or any portion of them, to the plaintiff in such suit; or to hold the same in trust for or to the use and benefit of such plaintiff, for or on account of any matter, thing, or transaction which was had, done, suffered, or transpired prior to the date of such patent, unless suit is commenced within five years from the date of such patent, or within one year from the passage of this act."

When this provision was enacted there was a general limitation law in the State providing certain specified periods in which actions and suits were required to be commenced. This special limitation was evidently intended to apply to a particular class of cases at the time of its enactment. Section 501 of the Civil Code was in force, which provided, in effect, that whenever any person claimed any real property as donee of the United States by virtue of the settlement under the donation law, and the patent therefor had been wrongfully issued to another, such person might maintain a suit in equity against

the patentee for the purpose of having such patent canceled, and the estate or interest of the plaintiff in the property ascertained and established; and that if it appeared in such suit that the plaintiff had made the settlement under the law, and had complied with its terms, he should be deemed to have a legal estate in fee in the property, although the patent had issued to another; but there was no period of limitations provided, either in said section or in the general limitation law of the State in which such suit should be commenced, and we may infer that said amendment was intended by the legislative assembly to apply to cases arising under said section 501. It was that section which allowed a suit to be maintained to cancel a patent, and the fact that the time for its commencement was not limited, and that the provision of limitation was a special one, show that the five years' limitation in which to commence the suit referred to in said amendment was intended as a limitation of the time in which suits must be commenced to enforce rights which section 501 provides for the enforcement of. The language of the amendment does not directly apply it to the section. The latter authorizes the maintenance of a suit to cancel a patent, establish the estate or interest of the plaintiff in the property, and provides that he shall be taken and deemed to have a legal estate in fee therein; while the former inhibits the maintenance of a suit to set aside, cancel, annul, or otherwise affect a patent, or to compel the patentee to convey to the plaintiff, or to hold in trust for his own benefit, unless the suit be commenced within five years. The difference, thus far, between the two provisions is more in verbiage than in substance. Additional terms, presenting different phases in which the remedy might be attempted to be applied, were inserted in the amendment, doubtless as a matter of prudence.

Again, the section specifies the grounds upon which the suit may be brought, viz., when the plaintiff has made a settlement under the donation law and complied with its conditions, and the patent has wrongfully issued to another. The draughtsman of the amendment evidently intended not only to cover the case mentioned in the section, but every other conceivable case

of the kind that might arise, and hence uses the general language, "for or on account of any matter, thing, or transaction which was had, done, suffered, or transpired prior to the date of such patent"; but it all refers back, and is made applicable to the setting aside, canceling, nullifying, and affecting a patent. The matter, thing, transaction, etc., set out in the amendment were intended to be such as were calculated to affect the end; that would tend to establish that the patent had issued to the wrong person, and that the plaintiff in the suit, by prior settlement and compliance with the conditions of the donation law, had entitled himself to the patent. Hence, it was only in cases where there was a conflict between rival claimants to the donation from the government of the United States, or of a grant from this State, that the limitation specified in said amendment was intended to apply. The case under consideration does not fall within that class of cases, and consequently the said five years' limitation has no application to it whatever; and, as said by the counsel for the respondent, its application to cases of the latter character — cases where the donee had obligated himself by contract, prior to the passage of the donation law, to do or perform some act when he acquired title to the property — would lead to the greatest absurdity.

Prior contracts were upheld by the donation act, and it is known to the court as a part of the history of the country that donees under it had, in many instances, contracted away a large portion of their claims before it went into effect; but that class of contracts created no competition as to whom the patent from the general government should issue to and were unaffected by the said amendment to said section 378. None of the other provisions of the Statute of Limitations in this State are applicable to the case, though the appellant's counsel claims that Coffin had constructive possession of the premises by virtue of the patent from the United States, which was transmitted to Carter by the deed of August 20, 1870, and was succeeded to by appellant, and that the respondent, and those under whom he claims, not having been seized or possessed of the premises for the period between the date of the issuance of the patent until December,

1882, were barred of all claim or interest therein; but we are unable to agree with the counsel that Coffin had constructive possession of the premises after he executed the deed of June 25, 1850. By that deed he had released, confirmed, and quit claimed unto Lownsdale, his heirs and assigns, forever, the property, and covenanted to warrant and defend it against the claim of all persons, the United States excepted, and in case he obtained title from the United States that he would convey the same (the title) to Lownsdale by deed of general warranty. He was in possession of the property at the time said deed was executed, and the effect of that deed transferred the possession, and he certainly did not become re-invested of it by force of the patent. The donation act recognized the legitimacy of such occupancy, and granted title to the settler when qualified under the law, and the patent confirmed it. Possession followed the settlement, and would have remained in Coffin had he not parted with it. Coffin could not rightfully claim, after the execution of said deed of June 25, 1850, to have had possession in law of the premises therein described, in the face of that instrument. The deed operated upon the possession as an alienation of it, and estopped Coffin from rightfully reclaiming it.

As to the matter of the legality of the tax sale for the street improvement, we have concluded not to express any opinion. It was entirely irrelevant to the case, and should have been stricken out of the complaint. The appellant's counsel suggested on the argument that the court ought to look into the question, and if it found that the equities arising out of the other branch of the case were with the respondent, and that the tax sale was legal, reverse the decree of the Circuit Court, upon the ground that the respondent had an adequate remedy at law. If appellant had not answered, and the case had come here upon demurrer upon that ground, this court would have been inclined to sustain it; but by answering the complaint the appellant has submitted to the jurisdiction of the court, and it would not, under the circumstances, feel warranted in dismissing the suit. Besides, the decision only involves a question

of costs, which this court has power to regulate and direct payment of as the equitable circumstances require.

A decree will therefore be entered in favor of the respondent and against the appellant for the relief demanded in the complaint; that neither party recover costs upon appeal or in the Circuit Court; and that the respondent be directed to pay the entire disbursements of both courts that are properly taxable as such, when duly taxed; and that the decree appealed from in other respects be affirmed.

[NOTE. —LORD, J., stated orally that he concurred in what was said of the possession of the respondent. He had constructive possession of the property in controversy by virtue of his deed, and it was this possession which barred the right of the appellant under section 378 of the Code. The position of the appellant is that neither the respondent nor his grantors ever held such possession as would limit the right of the former to commence suit under section 378, or to plead it as a defense. This position was untenable.

With him concurred WALDO, C. J. —REP.]