GEST *v.* PACKWOOD *et al.*, (ABELL, Intervenor.)

*(Circuit Court, D. Oregon.* August 5, 1889.)

1. MORTGAGES—AGREEMENT FOR SECURITY.
    A written agreement for security on certain property for the payment of a debt is in equity a mortgage. and will be enforced as such against all parties to the agreement, and those who have notice of it.

2. SAME—LEASE AS MORTGAGE—RIGHTS OF PARTIES.
    R. gave his notes to C. & P. in payment on the purchase of a mining ditch and grounds, and agreed in writing with them that, if such notes were not paid when due, he would reconvey the property to them as security for their payment. The notes not being paid, R. gave C. & P. a lease of the property, with a right to apply the net profits and proceeds from year to year on these notes. *Held (a)* that, the agreement to give security being in equity a mortgage, the lease. with a pledge of the rents and profits, was accepted as a fulfillment of the agreement, and the agreement and lease. taken together, created a continuous lien on the property in favor of the payee of the notes or his assigns from the date of the agreement; *(b)* that the assignment of the rents and profits of the property to the lessees for the payment of the notes created a lien on the body of the property, which, in case the rents and profits are insufficient to pay the same, may be enforced in equity: *(c)* during the possession under this lease the lessees were not authorized to charge the property with the expense of operating or improving it, and, if the expenditures in any one year exceeded the receipts, such excess was their personal debt.

3. EQUITY—STATUTE OF LIMITATIONS.
    In the consideration of purely equitable rights and titles courts of equity are not governed by the statute of limitations.

4. FEDERAL COURTS—JURISDICTION—CITIZENSHIP—VENDEE OF EQUITABLE INTEREST.
    The sale of an equitable interest in land is not the mere assignment of a right of action thereabout, and in a suit in a national court by the vendee, to establish his right therein, it is not material what the citizenship of his vendor is.

5. SAME—PARTIES—JUDGMENT IN STATE COURT.
    The plaintiff in a decree in a state court, given in a suit to enforce the lien of a mortgage on real property, is a proper party to a suit in a national court to enforce an alleged prior lien on the same property, and in such suit the validity and effect of such mortgage and decree may be inquired into, and determined as an original question.

*(Syllabus by the Court.)*

In Equity. For former report, see 34 Fed. Rep. 368.
*Zera Snow,* for plaintiff and Abell, intervenor.
*Charles P. Heald,* for defendant Grover.
*Sidney Dell,* for defendant Packwood.

DEADY, J. This case was heard on the bill and supplemental bill of the plaintiff Gest, the cross-bill of the intervenor, Abell, and the answers thereto of the defendants Packwood, Grover, and Emma B. Carter, and sundry stipulations as to matters of fact. From these it appears that on February 15, 1873, the Eldorado ditch, and certain mining property connected therewith, situated in Baker county, Or., and then owned by the Malheur & Burnt River Consolidated Ditch & Mining Company, and hereafter called herein the "Malheur Company," was sold to T. J. Carter and W. H. Packwood for $43,000, on two judgments obtained on May 20, 1872, in the circuit court of the state for said county,—the one by C. M. Carter, for $20,330.77, and before that date assigned to T. J. Carter, and the other by Packwood, for $17,362.18; in the aggregate, $37,692.95.

A certificate of sale was given by the sheriff to the purchasers, in which the property is designated as the "Eldorado Ditch," "particularly described as follows: Commencing at or near Malheur City, Shasta mining district, Baker county, Oregon, and extending to the North fork of Burnt river, via Kuntz creek, Deer creek, Rock creek, East Camp creek, West Camp creek, Bull's run, and Coyote creek, together with all the water-rights and franchises thereunto belonging, or in anywise appertaining thereto;" and on May 23, 1873, at Baker City, the purchasers assigned said certificate to Arthur Rice, by the following indorsement, written over their hands and seals: "For value received, and in accordance with an agreement of even date herewith, we hereby assign the within certificate of sale to Arthur Rice." Said ditch was then about 80 miles in length, and had a capacity of about 1,200 miner's inches of water.

On the same day an agreement—the one referred to in the assignment —was made by Carter, Packwood, and Rice, over their hands and seals, in the presence of two witnesses, in which, after reciting the recovery of the judgments aforesaid, the sale of the Malheur Company's property thereon, and the confirmation thereof, it is stated that Carter and Packwood have sold and bargained, and by these presents do hereby sell, bargain, and convey, unto "Rice, the certificate of such sale;" that in consideration thereof Rice "agrees to execute and deliver" to Carter and Packwood certain promissory notes, aggregating in amount $29,700, indorsed by Clark, Layton & Co., and payable as follows: To Carter, four notes, one for $8,000, one for $4,000, and two for $3,000 each, to become due on the 23d of August, September, October, and November, 1873, respectively; to Packwood, four notes, one for $2,500, one for $3,500, one for $3,000, and one for $2,700, to become due on the 1st of July, October, and December, 1873, and March, 1874, respectively; that "Clark, Layton & Co. shall also indorse and acknowledge themselves bound by the terms of this agreement;" and that "in case of the non-payment of any of said notes" said Rice "shall reconvey" the property to Carter and Packwood, "by good and sufficient conveyance, to be held as security for the payment of said notes."

On the same day the notes were made, indorsed, and delivered as provided in the agreement, and an indorsement made on the latter and

signed by Clark, Layton & Co. to the effect that they were the indorsers of the notes, and "acknowledge the binding force of the within agreement upon us, as such indorsers."

In all this transaction it appears that Rice was acting for Clark, Layton & Co., as well as himself, and that at the date of the assignment of the certificate and sale of the property to Rice he paid Carter and Packwood on account thereof, in addition to the notes given as aforesaid, $10,000 in cash.

On July 21, 1873, no redemption having been made from the execution sale to Carter and Packwood, they wrongfully, and without the knowledge or consent of Rice, obtained the sheriff's deed to the property, which fact coming afterwards to the knowledge of Rice, he had the execution of said agreement on December 11, 1873, duly proved by the oath of a subscribing witness thereto, and on the 15th of the same month the agreement was duly recorded in the record of "Leases and Agreements" for said county; and on December 3, 1874, he caused the certificate of sale to be duly recorded in the record of "Sheriff's Certificates" for said county.

On the execution of the agreement of May 23, 1873, Rice went into the possession of the property, and operated it openly and notoriously until May 4, 1874, and improved and enlarged the same at a cost of near $15,000.

On May 4, 1874, a large portion of the indebtedness evidenced by the promissory notes mentioned in the agreement of May 23, 1873, being unpaid, Rice and Clark, Layton & Co. of the first part, and Carter and Packwood of the second part, for the purpose of further securing the payment of the unpaid portion of said notes and other indebtedness of said Malheur Company, and establishing certain priorities in the payment thereof, made an agreement, in which it was recited, wrongfully, however, that the parties of the second part were then "the owners in fee" of the property in question; and also that on May 23, 1873, they agreed to sell the same to the parties of the first part for the consideration therein mentioned, and "delivered the possession" thereof to them, and that the parties of the second part were to convey the property to the parties of the first part on the payment of said notes; that the latter, "in addition to the possessory title to said ditch property under said agreement" of 1873, have other mines and property in the vicinity, and particularly described in Schedule A, annexed hereto.

It is then stated in the agreement that, in consideration of the premises and the covenants of the parties of the second part, the parties of the first part "hereby demise, let, lease, and surrender possession, and by these presents have demised, let, leased, and surrendered the possession, to the parties of the second part, of all of said property, to have and to hold the same from the date hereof, during the ensuing year, and from year to year thereafter, until the notes and demands, debts and judgments, hereinafter mentioned shall have been paid, the parties of the second part yielding and paying, as rent therefor, the net proceeds and profits of water sales from said ditches, and proceeds and profits of the

workings or sales of said mining grounds, to be accounted for monthly on a gold coin basis during the mining season," to J. W. Virtue, as trustee, who shall apply the same on the debts due to the parties of the second part and others, as set forth in Schedule B, annexed to the agreement; that when said debts are paid by said "rents, proceeds, and profits," or otherwise, by the parties of the first part, the "lease shall determine," and the parties of the second part will surrender the possession of the property, and convey their interest in the same, to the parties of the first part.

Then follow, among others, clauses to the following effect: The party of the second part will construct a ditch from Eldorado ditch to the Middle fork of Burnt river, a distance of about six miles, with a capacity of about 300 inches of water, this extension to be made "as soon as snow goes off, and the cost to be considered a part of the expenses of operating said ditch this season," and, "when finished, to be considered a permanent improvement of Eldorado ditch, to inure to the benefit of the parties that are or may be entitled to said ditch property;" that the parties of the second part "shall use due skill, diligence, and economy" in operating said property, and "may be allowed a superintendent's salary not exceeding $2,000 per annum, to be considered as a part of the expenses of operating the property during the lease;" that if any of the debts mentioned in Schedule B, as due T. J. Carter, W. H. Packwood, J. W. Virtue, and J. A. Packwood, have passed to other parties, and the parties of the first part are forced to pay them * * * in any other manner than out of the rents and profits and proceeds of the property herein mentioned, * * * the trustee shall apply the said rents and profits coming into his hands to reimburse the parties of the first part for such amount so paid * * * at the time and in the order set forth in said Schedule B; that the parties of the first part do not assume the payment" of said debts "in any other manner than out of said net rents, profits, and proceeds of said property, as fast as the same may accrue in the hands of the trustee."

Carter and Packwood went into possession under this agreement, and operated the ditch until 1880, when Carter died, and the possession and operation of the property was continued by Packwood until the appointment of a receiver on May 9, 1887.

On November 2, 1878, this suit was commenced by the plaintiff, Gest, who is a citizen of Illinois, and by sufficient mesne conveyances was then and now is the successor in interest of Rice & Clark, Layton & Co., against Carter and Packwood, for an accounting, and a conveyance of the legal title of the property wrongfully obtained from them by the sheriff.

Subsequently, on March 31, 1879, the plaintiff, by leave of the court, amended his bill, so as to make L. F. Grover, William S. Ladd, and W. J. Leatherwood, parties defendant, with appropriate allegations and prayers, to the end that a certain mortgage on the property then held by Grover, and two judgments held by Ladd and Leatherwood, respectively, against Carter, might be declared of no effect as against the right and interest of the plaintiff in the property. In due time the bill was taken

for confessed as against these defendants. Carter and Packwood answered, admitting the allegations of the bill generally, but alleging that the sheriff's deed was made to them without solicitation, because "they were the purchasers of the property," and stating an account, from which it appears that the expenditures incurred in the operation of the property and the construction of the extensions to the ditch largely exceeded the receipts; and thereupon the case rested until the appointment of the receiver. On January 31, 1888, Henry C. Abell, who is a citizen of Illinois, intervened, by leave of the court, and filed a cross-bill, setting up that he was the owner of the notes numbered 1 and 2 in Schedule B, for $3,000 each, made in 1873, and payable to Carter on October 23 and November 23, 1873, respectively; and alleging that as such owner he had the first lien on the *corpus* of the property for their payment, which he asked might be enforced. On January 21, 1888, the suit was revived against Emma B. Carter, the widow and successor in interest of T. J. Carter, who answered, admitting the allegations of the bill, and submitting herself to the judgment of the court.

By the answers of Packwood to the bill and cross-bill it appears that during the period he was in possession the expenditures exceeded the receipts by $36,586.51, for which sum he claims a first lien on the property. It also appears that some of this expenditure was caused by the construction of new or extension ditches, and that in the year 1874, when the extension to the Middle fork of Burnt river was made, as provided in the agreement of that year, the receipts were $12,235.48, while the deficit was $15,036.74. And it also appears that in the years 1876, 1878, and 1879 the receipts exceeded the expenditures by $828.17, $5,001.04, and $2,842.66, respectively, or $8,671.87 in the aggregate.

Before the making of the agreement of 1874, the note for $2,500 mentioned in the agreement of 1873, and payable to Packwood on July 1st of that year, was paid by Gest's predecessors in interest, and since the making of the same and before the commencement of this suit they paid on the notes given in 1873, and set out and numbered in Schedule B, as follows:

| | |
|---|---|
| No. 3, to Packwood, due October 1, 1873, | $ 3,500 00 |
| No. 4, "   " ($3,000,) " December 1, 1873, | 2,951 34 |
| | $ 6,451 34 |
| No. 6, to Virtue, due October 23, 1873, | 2,200 00 |
| No. 15, to Carter, " August 23, 1873, | 8,000 00 |
| No. 16, "   "   " ($4,000) September 23, 1873, | 1,500 00 |
| Total amount paid, | $18,151 34 |

Soon after the delivery of the notes to Carter and Packwood, under the agreement of 1873, and before the making of that of 1874, Carter indorsed the notes now held by Abell, and numbered 1 and 2 in Schedule B. and delivered them to his brother, C. M. Carter, on account of his indebtedness to the latter, who thereupon indorsed the same, and delivered them to the First National Bank of this city as security for advances

then and to be made, where they were held and remained until they were transferred to Abell for a valuable consideration, in November, 1886, indorsed in blank by T. J. and C. M. Carter. On July 6, 1887, C. M. Carter was adjudged a bankrupt in the United States district court for this district, and by the order of said court the interest of said Carter in said notes was released to said bank on account of the indebtedness of the former to the latter, then amounting to $8,200, with interest. Prior to Carter being adjudged a bankrupt, and after the transfer of the notes to the bank, Carter assigned his interest therein to Grover, subject to the right of the bank, and so notified the latter.

On January 4; 1874, T. J. Carter conveyed his interest in the undivided half of the property to his brother, C. M. Carter, by a deed of quitclaim, as security for an antecedent debt of $30,000, evidenced by his note of that date, payable in one year thereafter, with interest at 1 per centum per month, which mortgage was duly recorded on April 17, 1874. C. M. Carter took said mortgage with knowledge of the agreement of May 23, 1873, and the possession of the property by Rice thereunder. On April 17, 1876, C. M. Carter assigned this note and mortgage to his brother-in-law, L. F. Grover, in payment of an antecedent debt of $6,700, who took the same with the like knowledge of Rice's interest in and possession of the property that his assignor had.

On February 8, 1879, Grover brought suit in the state circuit court for Baker county to enforce the payment of said note by the sale of the mortgagor's interest in said property, wherein, on May 19, 1879, he obtained a decree against T. J. Carter for the amount of the note and interest, which decree was therein declared to be a lien on the premises from the date of the mortgage. The sale of the property on this decree was enjoined by order of this court on July 21, 1879.

On October 21, 1887, the defendant Grover, by leave of the court, filed a plea to the bill, to the effect that he is a *bona fide* purchaser for a valuable consideration without notice, and an answer in support thereof. On argument the plea was held bad, because the consideration between Carter and Carter and the latter and Grover was only an antecedent debt, and the quitclaim to Grover's assignor was notice to him and his assigns that he purchased nothing but what his vendor had. 34 Fed. Rep. 368.

Grover then had leave to answer over, but the answer contains nothing material beyond what was in the plea and answer, except the statute of limitations, which will be noticed hereafter.

Packwood admits the case made in the bill and cross-bill, so far as the execution of the two agreements and the making and delivery of the several notes thereunder are concerned, and the transfer of those numbered 1 and 2 in Schedule B to the plaintiff in the cross-bill of Abell. But he contends that the agreement of 1874 created a trust of which he and Carter were the trustees, and Rice and Clark, Layton & Co. the beneficiaries; that as such trustees they had a right to charge the property with the necessary cost of operating it, and that the excess of expenditures so incurred over receipts are a first lien on the property. On this

theory they seem to have incurred indebtedness right and left, and to have been trusted by the public without stint.

But there is nothing in the nature of the transaction nor in the language of the instrument that gives any countenance to this proposition. The agreement is a lease in which Carter and Packwood are the lessees, and Rice and Clark, Layton & Co. are the lessors. The lessees agree to pay the lessors, as rent for the property, "monthly, during the mining season," the net profits and proceeds of the property. It is styled a "lease" in the body of the writing, and the operative words "hereby demise, let, lease, and surrender possession," are those of a lease. It is not only a "lease," but only a lease "from year to year," to continue, indeed, until certain debts are paid by the rent, at the option of the lessees. Therefore the deficit which the lessees have made in the operation of this property is their personal indebtedness, and they alone are responsible for it. The remedy of the lessees, if they found they could not operate the property with profit or without going in debt, was to surrender it to the lessors, which they were at liberty to do at the end of any year after it came into their possession. But as long as they operated it each year's operations stood by itself. If there was any profit, the lessees were bound to pay it over to Virtue, the trustee for the lessors, "month by month, during the mining season" of each year. The surplus of one year cannot be applied on the deficit of another. The deficit of 1874, even if caused by the construction of the extension of the ditch that year, must be borne by the lessees. True, they were authorized to make this extension by the agreement of 1874, and provision was made therein that the cost of such construction should be considered a part of the expenses of operation for that year. The necessary implication from this limitation, as well as the manifest purpose and intent of the whole contract, is that the lessees were not authorized to make any other extension of the ditch at the expense of the receipts or proceeds of the property, and this only from the receipts of that year.

It follows that the surplus of receipts over expenditures in the years 1876, 1878, and 1879, amounting to $8,671.87, are net profits, and should have been paid over to the trustee and applied on the notes of the lessors, as provided in the agreement of 1874. And for the purposes of this case equity will consider that done which should have been done. This surplus will then be treated as having been applied on the notes first due, but still in the hands of Packwood or Carter. To apply it on notes previously assigned by them, as notes 1 and 2, would give them the benefit of it twice. Having already appropriated this surplus to their own use they can only be made to account for it by applying it on such of the notes as have not been assigned. These are notes 4 and 5, payable to Packwood, December 1, 1873, and March 1, 1874, respectively. On note 4 the sum of $2,951.34 was paid by Gest's predecessors in interest, leaving $38.66 due thereon. Note 5 is for $2,700, which makes $2,738.66, plus the interest thereon. The surplus applied in payment of this amount as and when it accrued will

much more than satisfy it. The amount due on these notes, less the payment on 4, must therefore be considered paid at the time this surplus accrued, and should have been paid over to the trustee.

This leaves notes 1 and 2 unpaid in the hands of Abell, for which he claims the first lien on the property. Gest, as the successor in interest of Rice and Clark, Layton & Co., also claims a lien on the property for the sum of $20,651.34, plus interest at the rate of 10 per centum thereon from the date of the filing of the bill, which is the sum theretofore paid by said Rice and Clark, Layton & Co., on notes 3, 4, 6, 15, and 16, under the clause in the agreement of 1874 providing, in effect, that, if they paid any of these notes otherwise than from the rent of the property, they should be subrogated to the rights of the creditors thus paid, and be reimbursed out of the net profits and proceeds, according to the priority of the debt thus paid.

By the purchase of the property at the sale on execution, Carter and Packwood acquired an estate or interest in the premises which could be sold and passed to others. *Page* v. *Rogers*, 31 Cal. 305. Unless redeemed within the time prescribed by statute, they were entitled to a conveyance of the legal title to the property, and in the mean time were entitled to the possession thereof. Comp. of 1887, §§ 304, 307.

The agreement of 1873, together with the formal assignment of the certificate of sale, and the possession taken thereunder, was in legal effect a sale of this property, with a complete right in the vendee Rice to demand and have the sheriff's deed thereto in place of the vendors. *Page* v. *Rogers, supra.* The purchaser at an execution sale may assign or dispose of his right thereunder, and it is the duty of the officer to make and deliver a deed to the property accordingly. *Voorhees* v. *Bank*, 10 Pet. 479, 1 McLean, 226.

By the wrongful conduct of the vendors they obtained the sheriff's deed, instead of the vendee. But equity will treat them as mere trustees of the legal title thereby acquired, for the benefit of the latter.

It was the evident intention of the parties to the agreement of 1873 that the notes given thereunder for the purchase price of the property should be secured by a lien thereon. To this end it is provided that in case of the non-payment of any of them the property shall be reconveyed to the vendors, "to be held as security for the payment of the same." Nor was it to be " reconveyed" absolutely, but only as "a security for the payment of the notes."

The contemplated contingency actually happened. Only the first note was paid when it became due; and the agreement of 1874, which followed, was the reconveyance or security, which the parties finally concluded to give and take. The provision in the agreement of 1873 was, in effect, a contract for a mortgage,—that the property should in some way be returned to the vendors as a security for the payment of the notes,—and the lease of 1874 was the fulfillment thereof.

As against the vendee the vendors had a lien on this property for the payment of these notes from the time of their delivery to them, which equity will treat as a mortgage. As was said by Mr. Justice STORY, in

*Flagg* v. *Mann*, 2 Sum. 533: "If a transaction resolves itself into a security,—whatever may be its form,—it is in equity a mortgage." To the same effect is 1 Jones, Mortg. § 168 *et seq.;* and 3 Pom., Eq. Jur. §§ 1235, 1237. The instances and illustrations given by Pomeroy "show," as he says, (section 1237,) "that the form is immaterial if the intent appears to make any identified property a security for the fulfillment of an obligation."

The agreement of 1874 does not abrogate or destroy that of 1873, or anything that was done under it, nor does it profess to. Notwithstanding the misrecitals in the former, the vendees under the latter still act and are treated as the practical owners of the property, and lease the same to the vendors, as a means of furnishing the security for the payment of the notes contemplated in the agreement of 1873. That security consisted of the possession of the property, with a right to operate it, and through the instrumentality of the trustee, Virtue, to apply the rents coming to the lessors to the payment of the notes in the order set forth in Schedule B. The one agreement is an addition to and fulfillment of the other, and they must be construed and have effect as *in pari materia.*

This security, as bargained for in the agreement of 1873, and furnished by that of 1874, was intended for the payment of the notes into whosever's hands they might come. It was given for the benefit of the notes, and not that of Carter and Packwood, or any other person, only as and while they were the holders of them. *Phelan* v. *Olney*, 6 Cal. 478; *Pattison* v. *Hull*, 9 Cow. 747; *Grattan* v. *Wiggins*, 23 Cal. 30.

On the transfer of any of the notes the security bargained for in the agreement of 1873 followed it as an incident of the debt, and, when the security was formally furnished by the agreement of 1874, it followed the notes in the hands of third persons in the order prescribed in Schedule B, unless indorsed without recourse, even if they were ignorant of its existence. *U. S.* v. *Hodge*, 6 How. 279.

The security bargained for in the agreement of 1873 was the reconveyance of the property sold, for the purchase price of which the notes were given. The security actually given by the agreement of 1874 was a lease from year to year, with a pledge of the net profits and proceeds of the property until the debts were thereby paid. This was a continuing pledge, so far as the lessees were concerned, as long as any one of the notes was unpaid. And in equity it will be considered, if necessary for the security or payment of the notes, as a pledge of the *corpus* of the property.

"An assignment of the rents and profits of land as security for a debt is another mode of creating an equitable lien on the land in favor of the assignee; and the assignment of a lease by way of security produces the same effect." 3 Pom. Eq. Jur. § 1237. In *Ex parte Wills*, 1 Ves. Jr. 162, Lord THURLOW, in speaking of an assignment of rents and profits as a security, said: "It is an odd way of conveying, but it amounts to an equitable lien." See 2 Story, Eq. Jur. §§ 1064, 1064*a;* 1 Jones, Mortg. §§ 162, 171; *Insurance Co.* v. *Stephens*, (Utah,) 15 Pac. Rep. 253.

In the latter case it was held that where a writing provided certain ad-

vances made to a mining company should be repaid out of "the rents, issues, and profits," and the same were not sufficient for that purpose, a suit might be maintained to subject the mining property itself to a lien for the payment of such advances.

This case is strongly in point. It appears that the mining ground on which the profits of this ditch depends is substantially disposed of and worked out; that the ditch itself has been allowed to fall into disuse and decay, and the profits derived therefrom cannot be made to pay the interest on the schedule debts.

It follows that Abell is entitled to enforce this lien against the property so far as may be necessary to secure the payment of notes 1 and 2, now held by him. And Gest, as the successor in interest of Rice and Clark, Layton & Co., has a lien on the property for the reimbursement of the amount paid by them on notes 3, 4, 6, 15, and 16 of the Schedule B.

Except as to note 6, for $2,200, which was payable to Virtue, October 23, 1873, and was not mentioned in the agreement of 1873, the mortgage to C. M. Carter is subordinate to this lien. It is subsequent in point of time to the agreement of 1873, and must be postponed to the lien and security thereby created. But it is claimed that the agreement of 1873 was superseded by that of 1874, and the security provided by the latter substituted for the former, by which means the mortgage to Carter became the prior lien.

In my judgment there was no gap between the operation of the two agreements so as to give priority to the mortgage over the latter. The security for the payment of the notes was bargained and provided for in the agreement of 1873, which equity will treat as a mortgage. By the agreement of 1874 this bargain was completed by the creation of a specific security on the property, namely, a lease of the same with the right to apply, through a trustee, the rent in payment of the notes. There was no instant of the intervening time in which the lien was not in existence; and the agreement of 1874 did not create it, but only gave it specific form, and provided means for its discharge. The agreement of 1873 was, as now appears, duly proved and admitted to record before the execution of the mortgage; besides which the mortgagee had actual notice of the agreement of 1873, and the possession of the vendors under it; and his assignee, Grover, had the same notice.

But, the mortgage having been both taken and assigned for an antecedent debt, neither the mortgagee nor his assignee is a purchaser for a valuable consideration. Admitting, for the present, that the record of the agreement of 1873 was unauthorized, (Gest v. Packwood, 34 Fed. Rep. 371,) this circumstance is sufficient in itself to postpone the mortgage to the equities arising under the agreement of 1873, and recognized and provided for in that of 1874, in favor of the notes mentioned in the former, while in the hands of any one except the mortgagor, (Bank v. Bates, 120 U. S. 556, 7 Sup. Ct. Rep. 679;) and, the mortgage having been made by deed of quitclaim, the mortgagee and assignee thereby had notice that they only took what was left in T. J. Carter to convey, (Baker

*v. Woodward,* 12 Or. 10, 6 Pac. Rep. 173.) This was nothing but the dry legal title to the undivided half of the property, which in equity he held as trustee for his prior vendees under the agreement of 1873. See *Gest* v. *Packwood,* 34 Fed. Rep. 368, where this subject is considered at length on the plea of Grover to the bill.

And now it is said that this court has no jurisdiction over the Carter mortgage, because it has become merged in the decree of the state circuit court for the county of Baker, and thereby become a valid lien on this property from the date of its execution. The argument in support of this proposition seems to be based on the fact that section 720 of the Revised Statutes prohibits this court from granting a writ of injunction "to stay proceedings in any court of a state," except in bankruptcy proceedings. The decree in the state court was given by default. None of the parties to this suit, except Carter, were parties to that, and are not bound by the decree therein. This is not a suit to stay proceedings in the state court. The proceedings in that court were commenced after this suit was begun, and have long since terminated, unless the sale of the property by the sheriff is a part of such proceedings, within the meaning of the statute, which is not admitted. The sheriff and the defendant Grover appear to have been enjoined at an early day in the case, without objection, from making any sale of the premises under the decree of the state court. But the owner of the mortgage, and the plaintiff in the decree for its enforcement, or his assignee or vendee, if the decree had been assigned or the property sold thereon, is a proper party to this suit, in which the validity and effect of the mortgage and decree may be inquired into and determined as between the parties hereto, without staying proceedings in the state court.

The decree of the state court, as against the persons who were not parties to the suit therein, is of no more force or effect than the mortgage itself; and, if there had been a sale on it, the vendee thereat would have occupied the same position in this suit, if made a party to it, that Grover does now. The sale would only have passed the interest in the property conveyed by the mortgage,—the dry legal title to the undivided half of the property,—subject to all the equities existing between the mortgagor and his prior vendees.

The statute of limitations is pleaded to the cross-bill of Abell in the answers thereto.

In the consideration of purely equitable rights and titles equity acts in analogy to the statute, but is not bound by it. *Hall* v. *Russell,* 3 Sawy. 515; *Manning* v. *Hayden,* 5 Sawy. 379. The right of Abell, as the assignee and holder of notes 1 and 2 of Schedule B, to have the same first satisfied out of the property, is a purely equitable one, resting ultimately on the fact that by the agreement of 1873 an equitable lien or mortgage was created on the property as a security for their payment, which security was recognized and continued by the agreement of 1874, and which, on the failure of profits and proceeds, he is entitled in equity to enforce against the *corpus* of the property.

Abell's right to intervene in this suit, on leave of the court, by cross-

bill, is recognized in the courts of equity. It depends on the fact that, as the holder of the notes 1 and 2, he has a lien on the property which. is the subject of the litigation. In this proceeding, and by this means: he may obtain the same relief as if he was an original party plaintiff. *Bronson* v. *Railway Co.*, 2 Black, 524; *French* v. *Gapen*, 105 U. S. 509; *Savannah* v. *Jesup*, 106 U. S. 563, 1 Sup. Ct. Rep. 512; *Williams* v. *Morgan*, 111 U. S. 685, 4 Sup. Ct. Rep. 638.

The only question in the case in this connection is, has Abell or his assignors been guilty of laches in asserting this claim, whereby it has become stale?

No claim of personal liability is sought to be enforced on these notes against any one. The direct remedy on the notes against the parties thereto is barred long since.

The relief sought is simply the enforcement of the lien on the property, created to secure their payment. This lien, in my judgment, is a *vivum vadium*, or living pledge, and continues as long as the pledge of "net profits and proceeds." This pledge had no defined limit of time, and could only terminate with the payment of the notes, or by the rescission of the agreement creating it, at the option of the lessees, who might refuse to continue in possession as such at the end of any year.

The notes have not been paid, and the lessees have not surrendered the lease; and, while Abell or his assignors might have sooner asserted their right to enforce the payment of the notes out of the *corpus* of the property, on the ground that the "net profits and proceeds" under the management of the lessees had proved altogether inadequate thereto, they were not, in my judgment, bound to do so.

On the final hearing it was claimed, on behalf of the defendant Grover, that the relief now sought by the plaintiff, Gest, in the supplemental bill, is inconsistent with the case made and the relief prayed in the original bill, and therefore cannot be allowed. For this proposition, *Shields* v. *Barrow*, 17 How. 130, is cited and relied on.

But no objection was made to the filing of the bill at the time the application therefor was made, and it is a question whether the objection does not come too late now.

But, waiving this, there is nothing in the objection. The plaintiff, Gest, finding from the answer of Carter and Packwood that there were no "net profits of proceeds" of the property, and that they claimed there was a large deficit, allowed the suit to rest for some years. Afterwards Abell was allowed to intervene for his interest, and file a cross-bill, and, it appearing that he was entitled to a sale of the property to enforce the payment of his notes, and it further appearing that in the mean time the property had so depreciated in value and productiveness that it could not be made to pay the whole of the indebtedness mentioned in Schedule B, the only relief which Gest could obtain, under the circumstances, was the reimbursement out of the proceeds of the property of the sum advanced by his predecessors in interest in payment of certain of the notes in said schedule, as provided in the agreement of 1874. The supplemental bill was allowed on the theory that it did not make a new case,

but would enable the court to give the plaintiff that measure and kind of relief which, under the circumstances, was proper and possible. *Hardin* v. *Boyd*, 113 U. S. 756, 5 Sup. Ct. Rep. 771, is a late and instructive case on this subject, and very much in point.

There the bill alleged that a bond for a conveyance of land had been obtained from the vendor by fraud, and that the purchase price had not been paid according to the contract, and prayed that the bond might be canceled, for an account of the rents and profits and the amount paid on the purchase, that the title of the plaintiffs be quieted as against the vendee, and "such other relief as equity may require." At the final hearing the plaintiffs were permitted to amend the prayer of the bill, so as to ask in the alternative for a decree for the balance of the purchase money, and a lien on the land to secure the payment of the same.

On appeal, the supreme court affirmed the allowance of the amendment, saying, in effect, that it did not make a new case, but only enabled the court to adapt its relief to that made by the bill and sustained by the proof.

And, finally, it is now objected that the plaintiff is simply the last assignee of a contract or contracts for the title to, or interest in, real property; and, as it does not appear that all the assignors could have maintained this suit on the ground of their citizenship, he cannot do so. It was stated by counsel on the argument, and not denied, that as a matter of fact all such assignors had the citizenship to enable them to maintain this suit.

But it is not so alleged in the bill, which is drawn on the theory that the plaintiff is, and those through whom he claims were, successors in interest of Rice and Clark, Layton & Co., and not assignees of a mere right of suit on a contract to convey. And so the bill alleges that since May 4, 1874, the plaintiff Gest, "by a regular chain of conveyances and assignments," has acquired "all the right, title, and interest" which Rice and Clark, Layton & Co. then had in said property, or the rents, issues, and profits thereof. This being so, he is the owner of the property in equity, subject to the lease made to Carter and Packwood. The legal title was wrongfully obtained by the latter after their sale to Rice, and they hold the same in trust for their vendee. A sale and conveyance of the property to Gest under such circumstances, or of all the right, title, and interest of Rice and Clark, Layton & Co. therein, is the sale and conveyance of the beneficial interest in the property, and not the mere assignment of a right of action thereabout. *Manning* v. *Hayden*, 5 Sawy. 363; 1 Perry, Trusts, § 227. This author says:

"The right of a party who has been defrauded of the title to his land is not a mere right of action to set the deed aside, but it is an equitable estate in the land itself, which may be sold, assigned, conveyed, and devised."

See, also, *Bean* v. *Smith*, 2 Mason, 268; *M'Donald* v. *Smalley*, 1 Pet. 620.

A decree will be entered that the property be sold by the master clear of all liens, claims, and incumbrances held, claimed, or owned by the

parties to this suit, or any of them, and that the proceeds of such sale be applied as follows:

(1) To the payment of the taxable costs and disbursements of the plaintiff and the plaintiff in the cross-bill, including any unpaid expenses of the receivership; (2) to the payment of the notes 1 and 2 to the plaintiff in the cross-bill, Henry M. Abell, with interest at the rate of 10 per centum per annum from date; (3) to the payment to the plaintiff, William H. Gest, of the sum of $18,151.34, with interest at the rate of 10 per cent. per annum from the date of the filing of the bill herein, the same being the amount paid by Gest's predecessors in interest on notes 3, 4, 5, 15, and 16, in Schedule B of the agreement of 1874, and made and delivered in pursuance of the agreement of 1873; and (4) to the payment of the sum due the defendant Grover on the note and mortgage assigned to him by C. M. Carter, and the remainder of the notes in Schedule B, and not otherwise herein provided for, in equal parts; provided that note 6 in said schedule, payable to J. W. Virtue, on October 23, 1873, for $2,200, be first paid to the plaintiff, Gest, with interest from November 2, 1878, out of said proceeds, equally with said note and mortgage.

The surplus of $8,671.87 is hereby first applied on notes 4 and 5 in said schedule as of the respective years in which it accrued, and the remainder on the notes in said schedule not herein specially named and otherwise provided for, as therein numbered, and for all the exigencies of this suit, and the distribution of the proceeds of the sale herein, this surplus shall be taken and deemed to have been duly applied as herein directed, when and as it accrued.