NEWTON et al. v. EAGLE & PHENIX MFG. CO. (JOHNSON et al., Interveners).

(Circuit Court, W. D. Georgia, N. D.   February 9, 1897.)

1. BANKS AND BANKING—LIENS—PLEDGE OF PERSONALTY—SECURITY OF DEPOSITORS.

Act Ga. Feb. 17, 1873, authorizing a corporation to establish a savings department, requiring such company to pledge its entire capital stock and property for the payment of the depositors, and providing that deposits might be received after such pledge, did not, of itself, create a lien on such capital stock and property, since it authorized and required the company so to do, and contemplated the security of depositors before the receipt of deposits.

2. SAME—MORTGAGE.

A resolution of the stockholders authorizing the directors to put into operation a savings department, and action by the directors thereunder, declaring the entire property of the company pledged for the payment of depositors, was not a full compliance with the authority and requirements of Act Ga. Feb. 17, 1873, authorizing and requiring a corporation to pledge its entire capital stock and property for the payment of depositors in its savings department, since such statute contemplated a mortgage on such stock and property.

3. SAME—EQUITABLE LIEN.

Act Ga. Feb. 17, 1873, authorized and required the Eagle & Phenix Manufacturing Company to pledge its entire capital stock and property for the payment of depositors in a savings department authorized to be established. The directors under authority of a stockholders' resolution, declared the entire property of the company pledged for the payment of such depositors. *Held*, that such action of the stockholders and directors constituted an equitable lien upon such property in favor of depositors, or those who became depositors, in such savings department, though no particular person was named, enforceable against the company and others with notice.

4. SAME—NOTICE—CONTENTS OF DEED.

A deed of trust conveyed the real and personal property of a corporation to secure payment of bonds issued to pay depositors in its savings department. Such deed recited Act Ga. Feb. 17, 1873, authorizing and requiring such corporation to pledge its capital stock and property for the payment of such depositors; that large deposits had been received; that such company had not made any pledge of its capital stock or property for payment of depositors, nor created any lien or mortgage of any kind on its property. *Held*, that notice of an equitable lien existing on the capital stock and property of such corporation by reason of a pledge of such property declared by the directors under authority of a stockholders' resolution, and in pursuance of such act, cannot be implied from knowledge of the contents of such deed and bonds.

In Equity.  Bill by J. A. Newton, administrator, and others, against the Eagle & Phenix Manufacturing Company.  On demurrer to the intervention of J. W. Johnson and others.  Overruled.

Ellis & Gray, for complainant.
Abbott & Cox, for defendant.
L. F. Garrard and W. A. Blount, for trustee.
McNeil & Levey, for interveners.
Glenn, Slaton & Phillips, for receivers.
Goetchius & Chappell, for creditors.

NEWMAN, District Judge. In 1873 the Eagle & Phenix Manufacturing Company was engaged in the manufacturing business, at Columbus, Ga. On February 17, 1873, an act of the legislature of Georgia in reference to said company became a law by the approval of the governor. That act, which authorized the establishment of a savings department, and which gives rise to the controversy now before the court, is as follows:

"Section 1. Be it enacted by the general assembly of the state of Georgia, that the Eagle and Phenix Manufacturing Company, of Columbus, Georgia, be and is hereby authorized to establish a savings department in connection with the business of said company, and to receive money on deposit from the employees of said company and others, and pay such rate of interest, not exceeding ten per cent, upon the same as the directors of said company may determine.

"Sec. 2. That the said company is authorized and is hereby required, to pledge the entire capital stock and property of said company for the payment of depositors and those holding certificates of deposits in said savings department, and each stockholder in said company shall be individually liable for the ultimate payment of depositors, and those holding certificates of deposits in said savings department, in proportion to the amount of his stock.

"Sec. 3. That after the said capital stock and property shall have been pledged, the said company may issue certificates of deposit to the amount equal to the amount actually deposited, in sums of five, two and one dollars, which may be payable to the holder of the same, and may be circulated by delivery as currency.

"Sec. 4. That the directors of said company are further authorized to make such by-laws and regulations as may be necessary for the proper management of said savings department."

Following this act, on March 20, 1873, at a stockholders' meeting of said company, as appears by the minutes, the following action was taken:

"John Peabody offered the following resolution, based upon the charter granted by the general assembly to this company authorizing a savings department, and the issue of certificates of deposit to be circulated as currency: 'Resolved, that the directors be authorized to put into operation the savings department according to the charter, and to proceed to the erection of an additional mill,'" etc.

Subsequently, as appears by the minutes, at a meeting of the directors of the company, the following action was had:

"Columbus, Ga., March 20th, 1873. At a subsequent meeting of the directors the following motion was made and unanimously passed: 'That by the authority delegated by the stockholders and authorized by the charter of the savings department, that the entire property of the company and of the stockholders individually in proportion to their shares is hereby pledged for the payment of depositors and those holding certificates of deposit in said savings department.'"

The marginal note to this action of the directors was as follows:

"Pledge of the total assets of the Co. and the property of shareholders to depositors."

Subsequently the interveners and others made deposits with the company, balances of which still remain in their favor unpaid. While the fact does not appear in the intervention which is now being heard on demurrer, it is conceded that no question is involved as to certificates of deposit, a large number of which were issued to be used as currency; they having all been redeemed, and none

of them being in question here. The indebtedness of this intervener and others, who have been heard by counsel in argument, and probably all that is now outstanding, is evidenced by pass books issued by the savings department, and held by depositors showing deposits and balances. Another fact alluded to in the argument, and not controverted, and which was evidenced by one of these pass books, may be mentioned, and that is that inside of each of these pass books was pasted a printed slip, stating the action of the company with reference to securing depositors in the savings department, as has been set out above. On the 18th day of February, 1891, the company, by action of its stockholders, ceased to receive deposits in its savings department, and by like action of its stockholders resolved to issue bonds to the amount of $1,000,000, to be sold for the purpose of paying off the deposits; said bonds to be secured by a mortgage or deed of trust executed by the company to the American Trust & Banking Company as trustee. Something over $900,000 in amount of said bonds have been issued and sold. The bonds so issued recited upon their face that they were "to be issued and used only to pay off deposits made in the savings department in said Eagle & Phenix Manufacturing Company, established under act of the general assembly of Georgia, Feb. 17, 1873." The recitals in the deed of trust made by the Eagle & Phenix Manufacturing Company to the American Trust & Banking Company as trustee, so far as material here, are as follows.

"Whereas, under an act of the general assembly of Georgia entitled 'An act to authorize the Eagle & Phenix Manufacturing Company, of Columbus, Georgia, to establish a savings department, and to provide for securing depositors' (which said act was approved February 17, 1873), the said manufacturing company did establish a savings department, and did receive money on deposit from the employés of said company and others, and continued to receive such deposits up to the 14th day of February, 1891. Whereas, the said manufacturing company did not at any time, by any action of its stockholders or directors, make any pledge of its capital or property for the payment of depositors, or those holding certificates of deposit in said savings department, and has not created any lien or mortgage of any kind upon the property of said company. Whereas, on the 14th day of February, 1891, the board of directors of said manufacturing company, at a meeting held at the office of said company on that day, passed the following resolution, to wit: 'Resolved, that the savings department of the Eagle & Phenix Manufacturing Company shall be wound up at as early a day as practicable; that no more deposits shall be received after this day in the savings department, and any money sent for that purpose shall be held subject to the order of the owner.' Whereas, afterwards, to wit, on the 18th day of February, 1891, at the annual meeting of the stockholders of said manufacturing company, the aforesaid action of the directors in discontinuing the said savings department was, by the said stockholders, ratified and confirmed, and the board of directors were authorized and directed to issue bonds payable in gold, bearing interest at a rate not exceeding six per cent. per annum, to an amount not exceeding the total amount due said depositors, which bonds and the proceeds thereof shall be used only in paying off said depositors; and said board of directors were further authorized and directed to cause a mortgage or deed of trust to be made upon the real and personal property of said manufacturing company, to secure the payment of such bonds, which mortgage or deed of trust shall be signed by the president and the secretary and treasurer of said company, and to be made to such person as trustee as the said board may designate, and for the benefit of the holders of such bonds; and to be further secured by keeping the said property so conveyed insured against fire for the benefit of

the bondholders. Whereas, instead of using and employing the money so deposited in said savings department in banking, or in banking loans, or investing in stock, bonds, or other securities, the board of directors of said manufacturing company employed the same to the extent of over one million of dollars in erecting additional mills and other proper and necessary buildings, and in the purchase of additional machinery, and in erecting a stone dam across the Chattahoochee river in order the more effectively and permanently to control the water power of said company; and have, in this way, added to and increased the value of the property of said company to an amount over one million dollars, all of which now belongs to said company, and forms a part of its capital and property; and for this cause it becomes necessary to issue bonds of said manufacturing company in order to pay off said deposits. Whereas, in order to pay off said deposits, and in pursuance of the authority duly conferred on them by said resolution, and by the charter of said manufacturing company and amendatory acts, the said board of directors, by resolutions duly adopted, determined to issue one thousand bonds of one thousand dollars each, aggregating in amount ($1,000,000) one million dollars, which amount does not exceed the amount of such deposits, and is sufficient to enable the said manufacturing company to fully pay off such deposits."

All of the property of the Eagle & Phenix Manufacturing Company was, on the 13th day of June, 1896, placed in the hands of receivers by order of this court. At that time there were still outstanding and due a considerable sum to depositors in the savings department; the amount due to each being evidenced, as stated, by the pass books of the several depositors.

The question now presented to the court is as to the relative priority of the two classes of creditors of the Eagle & Phenix Manufacturing Company, namely, the depositors in the savings department of the company, and the holders of the bonds secured by the trust deed referred to. In determining this question, the first matter for consideration is a construction of the act of the legislature of February, 1873. Did this act of itself create a lien on the property of the Eagle & Phenix Company,—did it create a present and effective lien, without further action on the part of the company? The second section of the act provides that "said company is authorized and hereby required to pledge the entire capital stock and property of said company," etc. The term "pledge" is evidently not here used in a technical sense, and could not have been. The term "pledge" strictly and technically refers to personal property, and involves a delivery of the property pledged. The intention clearly was that depositors in the savings department should have, as security for their deposits, the entire capital stock and property of the company; proper action of the company being authorized to this end. It is equally clear that this act did not, of itself, establish or create a lien, but it authorized the company to do so. The company, by the second section, is "authorized and required to pledge," etc. The language is not that the "property is pledged," but that "said company is authorized and required to pledge," etc. If there could be any doubt about this being the proper construction of this act, the doubt is removed by the language of the third section of the act, which is, "After said capital stock and property shall have been so pledged, the company may issue," etc. It seems too clear for discussion that the act contemplated that the company should take steps, before receiving any deposits, to give to depositors the security which the act authorized and required. Equally

clear is it that there was not a full compliance with the statutory authority and requirement. A mortgage was the only proper means by which the security contemplated by the statute could have been given. Inasmuch as depositors would change from time to time, a mortgage to each would have been impracticable, and perhaps the most effective, and, indeed, the proper, way to accomplish the result, would have been by a trust deed made to a trustee, who should hold for the benefit of all who, from time to time, might become depositors in the savings department of the company. That such a course as this, and proper record, was necessary to a compliance with the statute such as would give those who might become depositors in the savings department a right to stand upon the statute, and to claim constructive notice as against subsequent incumbrancers or purchasers, is manifest.

Passing from this, the next question for consideration is the contention of the interveners that, if they have not a statutory lien, strictly considered, they have, under all the facts, an equitable lien as against the company and those charged with notice. The claim is that, taking the act of the legislature, together with the subsequent action of the stockholders and of the directors, showing an evident intention to secure the depositors in the savings department with all the property of the company, that under the recognized principles applicable to the subject a court of equity will come to their aid, and enforce the transaction as an equitable mortgage. In 1 Jones, Mortg. § 162, the doctrine as to equitable mortgages is stated in this way:

"It has been noticed that a conveyance, accompanied by a condition contained either in the deed itself or in a separate instrument executed at the same time, constitutes a legal mortgage, or a mortgage at common law. In addition to these formal instruments which are properly entitled to the designation of mortgages, deeds and contracts which are wanting in one or both of these characteristics of a common-law mortgage are often used by parties for the purpose of pledging real property, or some interest in it, as security for a debt or obligation, and with the intention that they shall have effect as mortgages. Equity comes to the aid of the parties in such cases, and gives effect to their intention. Mortgages of this kind are, therefore, called equitable mortgages." "There are many kinds of equitable mortgages,—as many as there are variety of ways in which parties may contract for security by pledging some interest in lands. Whatever the form of the contract may be, if it is intended thereby to create a security, it is an equitable mortgage. It is not even necessary that the contract should be, in express terms, a security; for equity will often imply this from the nature of the transaction between the parties. For instance, a contract for security is, in England, and in some states of America, implied from a deposit of title deeds."

### And again, in section 165:

"Upon this principle, the entry of an agreement by a corporation upon its records that a certain bond for title should be pledged to certain of its members as security for liabilities which they were about to incur for the company was held to be an equitable mortgage; and, although a deed of trust was afterwards made in conformity with the resolution, yet these members, having acted upon the faith of it before the deed of trust was made, were held to be entitled to the security as from that time, and the deed of trust was regarded only as a confirmation of the agreement, and as having relation to the resolution."

Also from section 166 is taken the following:

"An instrument whereby a corporation 'pledges the real and personal estate of said company' for the fulfillment of a contract may be enforced as a mortgage against the company and all persons claiming under it with notice; and is not rendered invalid for the reason that the property of the company is pledged without specification, or that the amount secured is not stated, or the time of redemption fixed."

A case on which much reliance is placed for the interveners is that of Ketchum v. Railroad Co., 3 Cent. Law J. 704, Fed. Cas. No. 7,739, first decided by Circuit Judge Dillon. The rule, as applicable to the facts in that case, is stated by the court in this way:

"But the accepted doctrine of courts of equity in respect to equitable liens or charges will be found, we think, to support the conclusion we have reached. The cases clearly establish this legal proposition. If a debtor, by a concluded agreement with a creditor, sets apart a specific amount of a specific fund in the hands, or to come into the hands, of another from a designated source, and directs such person to pay it to the creditor, which he assents to do, this is a specific appropriation, binding upon the parties and upon all persons with notice who subsequently claim an interest in the fund under the debtor."

This case was subsequently in the supreme court (Ketchum v. City of St. Louis, 101 U. S. 306, 25 L. Ed. 999), and the decision of Judge Dillon was affirmed, two judges dissenting.

In Gest v. Packwood (C. C.) 39 Fed. 525, the case decided by Judge Deady, the rule is stated in this way:

"A written agreement for security on certain property for the payment of a debt is, in equity, a mortgage, and will be enforced as such against all parties to the agreement and those who have notice of it."

Applying the doctrine thus enunciated to the facts in this case, there seems to be no doubt that an equitable lien exists in favor of these interveners against the company and as against others with notice of the facts creating such equitable lien. It is said by the bondholders resisting this claim that an equitable mortgage was not created by the action of the stockholders and directors, because no mortgagee was named. It is true that no particular person was named as mortgagee, but a class of persons were named for whose benefit the pledge was made, and a class of persons easily capable of identification, and who must be identified before any rights can be declared in their favor. It is said, also, that this pledge of the property of the company was not made for the benefit of those who should become depositors in the future. This cannot be the case, because it is clear from the date of the act authorizing the savings department (February 17, 1873), and the date of the action of the stockholders and directors, March 20th thereafter, that, if the resolution of the stockholders and directors was not taken before any deposits were received (which is most probable), only a very small amount could have been received. The unmistakable intention of the action of both the stockholders and directors is that it should apply to all the depositors thereafter in the savings department of the company. I have no difficulty, therefore, in holding that in view of this act of the legislature, and the action taken by the stockholders and directors, and the evident purpose and intention of that action, together with what must have been understood and relied

upon by the depositors, an equitable mortgage exists in their favor, which will be enforced as such against the company and others with notice.

On the question of notice, in view of the last amendment filed by the interveners, there is great difficulty in making any satisfactory ruling at this time. The amendment alleged that $600,000, or some such large amount, of the bonds secured by the trust deed to the American Banking & Trust Company were purchased by stockholders and directors of the Eagle & Phenix Manufacturing Company, who had, at the time they took the bonds, full and actual knowledge of all the facts relied upon by the interveners to establish their priority here. So much of the question as relates to the effect of what appears on the face of the trust deed and the bonds themselves as notice to purchasers of the bonds may be now, however, properly determined. While it is true that the trust deed shows on its face the passage of the act authorizing the savings department, and while it is true that other recitals show that the deposits to a large amount were received, still there is nothing whatever on the face of either the trust deed or the bonds to show that any action such as that contained on the minutes of the company had been taken by either the stockholders or directors. The recital in the trust deed is that "the said manufacturing company did not at any time, by any action of its stockholders or directors, make any pledge of its capital or property for the payment of depositors or those holding certificates of deposit in said savings department, and has not created any lien or mortgage of any kind upon the property of said company." It cannot be that a statement that action of a certain kind has not been taken is notice that such action has been taken, in the absence of facts and circumstances calculated to arouse inquiry, or to suggest the untruthfulness of the statement. Nothing is seen upon the face of these papers to suggest to a purchaser otherwise innocent, and purchasing bonds in the due course of business, any doubt as to the truth of the statement made therein. More must be shown, therefore, than appears upon the face of the trust deed and bonds to charge a purchaser with notice of the equitable lien which is held to exist as against the company and those taking the bonds with notice.

With this expression of opinion, the matter as to how far each bondholder or set of bondholders are charged with notice of the depositors' equitable lien must be referred to the special master to be determined upon the facts and circumstances surrounding the several bondholders. An order may be taken, therefore, referring the whole matter as to the relative priority of the bondholders and depositors to the special master to hear evidence, determine and report upon the same.